Hwang Jin Yeong
# 02115-093; SS3-23L
Federal Correctional Institution
1900 Simler Avenue
Big Spring, Texas 79720

Defendant-Petitioner, Pro se.

FILED
DISTRICT COURT OF GUAM
AUG 27 2004
MARY L. M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * CIVIL NO: **04-00039** |
| Plaintiff-Respondent, | * Crim. No: CR-00-00150(JSU)(02) |
| | * |
| -versus- | * BRIEF IN SUPPORT OF PETITION |
| | * FOR RELIEF PURSUANT TO 28 USC |
| HWANG JIN YEONG, | * § 2255. |
| | * |
| Defendant-Petitioner. | * |
| | * |

....o0o....

Comes now the Defendant, Hwang Jin Yeong, Pro se, who respectfully submits this Brief in support of his 28 U.S.C. § 2255 motion hereto. The Petitioner respectfully shows the Court he is entitled relief in this action, and incorporates by reference the files, records, transcripts and exhibits hereto of the various proceedings in this case in support of this action.

## SUMMARY OF ISSUES PRESENTED

The Petitioner presents six issues as a basis for granting relief from the sentence in this case, set forth as follows:

I. Where Defendant Supplied All Pertinent Information against those he held knowledge about in his criminal charge, his chain of distribution, the identities and participation of those persons, He is entitled To Have Government honor its agreement and receive a downward departure pursuant to 18 U.S.C. § 3553.

A. **Presentence Investigation** Report **Constitutes** Part of **the** Agreement.

B. Detrimental **Reliance by** Defendant **Upon** Plea.

C. Rule 35 **Cannot** Compensate a § 5K1.1 Motion.

II. Assuming arguendo, the PSR is not part of the Plea Agreement, then using Counts II and III for enhancements, when they were to be dismissed, constitutes violation of Parol Evidence Rule, where nothing informs Petitioner these Counts would be used to enhance him, within the written agreement.

a. The plea is based on default rules.

III. Petitioner is entitled departure for Cultural Assimilation.

IV. Petitioner Informed his counsel, and the Interpretator, he was actually innocent, and counsel having Petitioner Plead Guilty Constitutes Subornation of Perjury.

V. Petitioner received Ineffective Assistance of Counsel.[1]

---

[1] Petitioner reserves herein the right to raise, and challenge, on COA or appeal, the denial of the First, Fifth and Sixth, and Fourteenth Amendments, based on the denial of a Fair and equal defense by denial of federal and states to provide adequate funding to ensure the constitutionally mandated effective assistance of counsel to indigent persons accused of a crime.)

These issues will be briefly argued in turn.

PROCEDURAL BACKGROUND

Petitioner was charged by Grand Jury on December 27, 2000 in Guam, to a three (3) Count Indictment. The charges were:

COUNT I: Conspiracy to import methamphetamine in violation of 21 U.S.C. § 952(a), § 960 and § 963;
COUNT II: Importation of methamphetamine in violation of 21 U.S.C. § 952(a), § 960, and 18 U.S.C. § 2, and
COUNT III: Attempt to possess methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a) and § 846.

On initial hearing January 3, 2001, Petitioner appeared in arraignment, pleading not guilty, before the Honorable John S. Unpingco. He was remanded into custody of United States Marshals. Prior to trial date Petitioner

-2-

pled pled guilty to Count I of the Indictment, Counts II and III were dismissed under the written plea agreement. The plea was additionally based on possible reduction for substantial assistance.

Probation Office, pursuant to the plea, prepared a Presentence Investigation Report (PSR) and gave it to the parties February 7, 2002. Sentencing was scheduled for March 13, 2002.

The plea agreement was made pursuant to Rule 11(e)(1)(B) of the F.R.Crim.Pro., outlining provisions for Petitioner's cooperation. In exchange for pleading to Count I, Counts II and III were to be immediately dismissed after sentencing. No provision retained use of these Counts for enhancement purposes. Petitioner additionally agreed to provide information known to him, not limited to the offense, where government agreed to move the Court for downward departure under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 when fixing sentence, or move the Court for relief pursuant to Rule 35 within one year after sentencing, government agreeing self-incrimination information would not be used in determining applicable guideline range under U.S.S.G. § 1B1.8(a).

Petitioner was sentenced November 13, 2002. Petitioner's base offfense level was 35, criminla history I, guideline range 168-210, after enhancements and reductions. Government moved for sentence at the "minimum under the Guidelines." SEN.Tr. at 24. No motion for departure was ever set before the Court relating

-3-

to substantial assistance, no inquiry was made. The Court imposed 168 months imprisonment upon Petitioner, credit for time served, five years supervised release, deportation under 18 U.S.C. § 3583(d), one urinalysis 15 days after release, no fine, and $100 Special Assessment fee. A timely Notice of Appeal was filed.

On appeal, Petitioner's counsel raised one issue for relief: whether his sentence was imposed in violation of USSG § 3B1.2 (mitigating role) where Petitioner was a minor participant. On June 20, 2003, the Ninth Circuit denied relief in a memorandum decision. Petitioner now brings this Motion for relief under § 2255, the one year ending September 19, 2004.

## FACTUAL STATEMENTS OF CASE

Petitioner has lived inside Korea all his life, never having been outside the country. He has never been involved into any illegal activity throughout his lifetime in Korea, and is a family man. Petitioner was taught to be respectful to all people, and to elders, taught not to backtalk, criticise, or be disrespectful to any person. In Petitioner's culture, family values are strongly set forth upon youths. Respect is required for a person to get along, and survive, in the Korea culture. Petitioner had these values strongly imbued into his morals and beliefs.

Petitioner, as a child, was influenced by American television movies. As result of these movies, he had tattoos set upon his youthful body. These are not acceptable in the

Korean culture, and because it interfered with Petitioner's daily living, Petitioner attempted to remove several, but some still remained upon his person. Those remaining were able to be covered. When Petitioner married his wife, she knew of these tattoos and knew they did not mean anything, being merely a childhood fault.

In KOrea, a man (husband) is responsible for the family. If the man must leave, the woman must return to her parents, or his, because she is not accepted in society as a single woman would be allowed, being of a married status. If the husband is not present to care for the wife and children, his or her father must assume responsibility. Because Petitioner was incarcerated, his wife must survive upon his parents in Korea, adding a financial burden to their life.

Petitioner was contacted by a friend to come to Guam for a vacation. He'd never been out of Korea. See EXHIBIT A hereto. He was foreign to America culture and laws; lacked the english language, and held no knowledge of the legal arena. Petitioner listened to his friend and came to Guam. Petitioner's friend had lived in Guam for years and spoke English well. Being Petitioner's first trip outside of Korea, he was ignorant of America's foreign customs, cultures, and the conspiracy trap that has divided America and turned family against family, friends against friends.[1]   Petitioner left Korea December 16, 2000 and was met and received in Guam by his friend, who took him to his apartment.

---

[1]   See Matthew 10: 34-38 of King James Bible, where the Christian King told he came to divide the land and families.

On December 20, 2000, a package arrived via airmail and addressed to Min Soo Kim, in Guam, from the Philippines. Customs and Quarantine Officer V.J. Camacho inspected the package and found 58 cans of "Gina Mango Nectar," and some woven baskets (PSR at 15; SER at 7). Shaking the cans, they rattled. Upon opening them, the inspector found a crystal liquid, which, upon field testing gave a presumptive positive reaction for amphetamine. (Id.).

The cans contained 14.18 kilograms (net weight) of 62 percent d-methamphetamine hydrochloride. (PSR at 21, SER at 8). The contents were substituted in 57 of the 58 cans with rock salt and water and resealed. (PSR at 17, SER at 8). The cans were then repackaged and agents from Customs, with FBI, made a controlled delivery of the DHL package to Unit L24 of the Tumon Village Apartments. (PSR at 17, SER at 8). Petitioner, at no time tried to conceal his identity. He signed for the package (because he had been requested too), and instructed the officer his brother Min Soo Kim had returned to Korea the previous night. (PSR at 17, SER at 8).

After obtaining the package, Petitioner left the apartment twenty-minutes later and drove to pick-up co-defendant Jae June Pak. (PSR at 18, SER at 8). Together, they drove to "Top J Building," and Petitioner and co-defendant entered Unit # 206 of the Top J Building. Both departed at approximately 7:45 p.m. and drove to the Korean Recreation Center parking lot in Tamuning, Guam. (PSR at 19, SER at 8).

-6-

At approximately 8:30 p.m., agents arrested Petitioner and co-defendant Pak when they returned to Unit # 206. Upon a search of the apartment, Unit # 206, the 57 cans were recovered empty, with the rock-salt and items used in the evaporation process (PSR at 20, SER at 8-9). Notably, in Korea culture it is custom to give salt for presents.

Petitioner was arraigned and pled not guilty on January 3, 2001. Trial date was set. On February 5, 2001, Petitioner entered a plea agreement (contract) with the United States of America, via its representative, the United States Attorney. In the plea agreement the government informed the "maximum sentence for conspiracy to import over 50 grams of methamphetamine is incarceration for life with a [minimum] mandatory term of incarceration of ten (10) years, . . .." The penalty provision were never set forth in the indictment. The Government also offered for Petitioner's cooperation, to recommend the minimum term of sentence under applicable guidelines, and for "substantial assistance" under 18 U.S.C. § 3553(e) request the Court to depart below the guideline range when the sentence is fixed. If not at sentencing, Government, within one year after sentencing, would move for relief under Rule 35 of the F.R.Crim.Pro.. This agreement was based on the stipulation of the probation officer fixing the PSR as part and substance to the plea agreement.

In the PSR, it states:

-7-

> In addition, if the defendant provides substantial
> assistance, the Government agreed to move the Court
> for a downward departure pursuant to u.s. Senetencing
> Guidelines (hereinafter U.S.S.G.) § 5K1.1 and 18
> U.S.C. § 3553(e), when fixing a sentence or the
> Government may within one year after sentencing, move
> the Court to order relief pursuant to Rule 35, Rule
> of Criminal Procedure. If the defendant provided
> information concerning the unlawful activities of
> others, the Government agreed that any self-
> incriminating information will not be used against
> him in determining the applicable Guidelines range
> pursuant to U.S.S.G. § 1B1.8(a).

PSR at ¶ 7.

Before sentencing, Petitioner offered and performed according to the plea and gave substantial assistance, to his knowledge. The Petitioner gave Government interrogating officers the following names:

1) Park, In Jong;
2) Kim, Yang Son;
3) Lee, Byung Soo, and
4) Park, Jung Yong.

That these were the only individuals Petitioner held knowledge of in the case because he was not involved into the illegal actions of these men. Petitioner offered all information he held knowledge about. Three of these persons were convicted in the instant offense. These men used Petitioner for their endeavors because of his ignorance. See EXHIBIT B hereto.

At sentencing, Petitioner's counsel moved for a downward departure for the participation as a 'minor' role in the offense, based upon a sentencing memorandum dated November 8, 2002. Apprendi was out at this time, but counsel never addressed elements relating to Apprendi rationale (Petitioner believes).

-8-

The memorandum included criteria for the "safety valve," and the court departed two points for 'safety valve,' and three (3) points for acceptance of responsibility. The court used the dismissed counts as mitigating role to add two points to Petitioner's sentence base. From a base level of 38, the total offense level ended at 35, criminla history category I. The applicable guidelines range was 168-210 months. The Court imposed the lower end for 168 (14 years), credit for time served, participation in the drug program (assumingly for a one year reduction), and requirement to obtain a high school diploma. A five year supervised release wa simposed with deportation under 18 U.S.C. § 3582. Fines were waived, and $100 Special Assessment was imposed. The court did not consider the deportation factor hindering program application since Petitioner was an alien, in its departures.

At no time during the sentencing phase did Government bring to the Court's attention, under USSG § 5K1.1, consideration of Petitioner's consideration and knowledge. The Court did not ask, and counsel did not request the Court's inquiry. The Plea agreement declared the final decision "Rests solely with the District Court," but the Court was never allowed to make any determination, except for the 'safety valve.' At no time was § 5K1.1 or 18 U.S.C. § 3553 made applicable to the Court. At no time did consel argue the minimum statutory application where there was no penalty provisions set forth in the indictment.

Counsel had instructed Petitioner to plead guilty, even

-9-

though Petitioner repeatedly instructed counsel he was actually innocent of the crime. During the plea proceeding, Petitioner had stood 'shocked,' because neither counsel nor the interpretator had read him the entire plea agreement, shipping ortions for their convenience. See EXHIBIT C hereto. Counsel instructed Petitioner that when the court questioned him, even if it was something Petitioner did not agree with, to tell the Court yes, so his plea would be accepted. Petitioner filed a timely notice of appeal through counsel.

Appeal was taken. Only one issue was raised by counsel regarding 'minimal role' of Petitioner. Petitioner lacked the means to assert additional issues be raised because of his lack of english and foreign status. The Appellate Court rejected this argument. On June 20, 2003, the Appellate Court affirmed the conviction. No rehearing was taken, no certiorari taken. Counsel filed with the Appellate Court dismissing himself as counsel, even though Petitioner requested he take certiorari. A delay extended, and Petitioner was denied his right to seek certiorari review from the Supreme Court because of counsel's and the Appellate Court's delays. Petitioner now brings this action for relief.

## TIMELINESS OF § 2255

Under the AEDPA Petitioner has one year to file a § 2255 once the case becomes final. Ninety days from the Appellate Court's June 20, 2003 decision sets the time at September 19, 2004. Petitioner's § 2255 is timely filed.

Case 1:04-cv-00039    Document 2    Filed 08/27/2004    Page 10 of 61

## ARGUMENTS

I.  Where Defendant Supplied All Information
    Against Those He Held Knowledge Of In His
    Crime, His Chain of Distribution, and The
    Identities, and Participaption of those
    Persons, He's Entitled To Have Government
    Honor The Agreement and Receive A    Down-
    ward Departure under 18 U.S.C. § 3553.

It seems under current trends, government prints off
boiler-plate plea agreements, having the superior knowledge,
without intent of honoring the wording within them. Cases like
United States v. Harris, No: 3:02-CR-23-DF; 3:03-cv-  -DF
(USDC, MD GA, 2002)(Pleading guilty, promising 5K1.1 or Rule
35 motion, and after gathering information and convicting
person, not affording defendant downward departure), inter
alia, the events promise defendants a downward departure (under
adhesive means), yet, at sentencing government fails to allow
the Court to make any determination whether the defendant has
earned such a motion. Thus, defendant, not governments, suffer
from the adhesive tactics government agents employ through
breach of contract.

At bar, the plea affords Petitioner a reduction in his
sentence "after" he has been sentenced by affording government
information under 18 U.S.C. § 3553, thus making the sentence
"retroactive" in effect. Government would most likely rely on
cases like Melendez v. United States, 116 S.Ct. 2057, 2061-
63 (1996), that holds a § 5K1.1 motion does not authorize a
departure below the statutory minimum without an accompanying
motion under 18 U.S.C. § 3553(e), and the Government is

-11-

entitled to make either under the terms of the plea agreement. Petitioner contends this case is different the Melendez and it agrees with this application.

To support this claim, Petitioner sets forth the points herein:

A. Presentence Investigation Report Constitutes Part of The Contractual Agreement.

Government, for arguendo, would contend the Presentence Investigation Report (PSR) is not part of the, nor partial to the, plea agreement. That this would hold no application regarding the plea entered into by Petitioner. However, the PSR brings forth sentencing factors and enhancements that Government relies upon, and contrary to the language, it cannot be separated from the plea agreement.

A case that agrees with Petitioner is Pine River State Bank v. Mettille, 333 N.W.2d 622, 627-630 (Minn. 1983). There, the question whether a handbook of an employer constituted part of the employee's promises. The court held it did. Like the handbook, the PSR is intended as a unilateral portion of the plea agreement that government promises. Government contends the Probation Office PSR report is an "independent application," but this creates a problem under the default and parole evidence rule (see issue hereafter), and therefore is misleading. Probation does make the final adjustments for the Court's consideration, on Government's behalf, being also an agency of the United States, and investigators on government's behalf, questioning for guideline determination. PSR at 2, line

-12-

1-14.    It affords government to enhance, or decrease, without

a jury, by facts calculated by the Probation Office, by gaining

an advantage by the sentencing provisions set forth, productive

work   load,   and   cooperative   efforts   of   other   government

officials.   In   the   PSR,   it   states   two   portions   that   holds

relevance in this matter:

> 6.    The defendant agreed to surrender to the Government
> or any lawful agency as may directed by the Court, any
> and all assets or portions thereof acquired of obtained
> by him as a direct or indirect result of any criminal
> activity. The defendant understood the maximum penalties
> for   the   offense   of   conviction.   In   return   for   his
> cooperation, the Government agreed to recommend that he
> receive   the   minimum   term   of   incarceration   legally
> available under the applicable statutes and Sentencing
> Guidelines.   If the defendant does   not   cooperate   as
> outlined   in   the   plea   agreement,   the   Government   will
> recommend whatever sentence of incarceration within the
> Guidelines range it may deem appropriate.
> 7.    In addition, if the defendant provides substantial
> assistance, the Government agreed to move the Court for
> a downward departure pursuant to U.S. Sentencing Guide-
> lines   (hereafter   U.S.S.G.)   §   5K1.1   and   18   U.S.C.   §
> 3553(e), when fixing a sentence or the Government may
> within one year after sentencing, move the Court to order
> relief pursuant to Rule 35, Rules of Criminal Procedure.
> If   the   defendant   provided   information   concerning   the
> unlawful activities of others, the Government agreed that
> any   self-incriminating   information   will   not   be   used
> against him in determining the applicable Guidelines range
> pursuant to U.S.S.G. § 1B1.8(a).

PSR at ¶ 6 and 7. Thus, like <u>Pine</u>, the PSR constitutes a part

of the written plea agreement and the terms of both constitutes

the understanding of the contractual agreement.

      B.    <u>Detrimental Reliance Upon The Plea</u>.

      Petitioner is entitled Specific Performance as set by the

Plea  Agreement.  <u>United  States  v.  Partida-Parra</u>,  859  F.2d  629

(9th  Cir.  1988).  There,  in  relation  to  specific  performance

-13-

of a plea, the Court stated:

> Where the government breaches a plea bargain, it may be appropriate for the court to order "specific performance" of the bargain. When the breach was a failure of the prosecutor to carry out a promise which was fulfillable, then certainly the defendant's request for specific performance should be honored.

Partida-Parra, at 859 F.2d 633. See also Santobello v. New York, 404 U.S. 257, 30 L.Ed.2d 427 (1971).

Here, the only co-defendant was Jae June Pak, Case CR00-00150-001. Petitioner gave information on four individuals, three of which were prosecuted and convicted, one being Mr. Pak. Government promised to move for a departure under § 5K1.1 and § 3553(e), or a Rule 35. At sentencing, at no time, prosecutor never brought up for the Court's inquiry anything relating to § 5K1.1, even though the final decision "rest[ed] solely with the District Court." PLEA AGREEMENT at pg. 4, ln. 6-8. To date, neither has any Rule 35 been filed or forthcoming. Yet, Petitioner gave names and all information he held knowledge of, and three were convicted as result of this information, all to Petitioner's detriment, based on Government's promises:

> The general rule is subject to the detrimental reliance exception. Even if the agreement has not been finalized by the Court, "a defendant's detrimental reliance on a prosecutorial promise in a plea bargaining could make the plea binding."

United States v. Savage, 978 F.2d 1136, 1138 (9th Cir. 1992).

Petitioner relied on Government's promise to move the Court under the plea or do a Rule 35. He was entitled, at minimum, to have government inform the Court for a final decision of his cooperation, what he gave them, that three were

-14-

prosecuted and convicted, only one being part of the instant case, and allowed the Court to determine whether a § 5K1.1 motion was suitable relief, or, to have Government allow him understanding regarding a Rule 35(b) motion on Petitioner's behalf. See also RESTATEMENT, SECOND, CONTRACT § 90.[2]

The failure of Government to fulfill the plea, in either manner, based on Petitioner's substantial performance and his cooperation, constitutes a breach of the plea agreement. Petitioner performed, giving all the knowledge he held. His performance resulted in his co-defendant, and two others, being prosecuted. Two were never part of the instant offense.[3]  Thus, Petitioner's reliance on these motions by government is one reason he entered the plea, See EXHIBIT C hereto. Petitioner is entitled that which he understood be promised, or, if government is unwilling to fulfill the plea, the right to withdraw the plea and obtain a new trial.

C.   Rule 35 Cannot Compensate a § 5K1.1.

A severe problem arises in this case. Not a simple one. Government has improperly compelled Petitioner to attempt to chose between what type of relief he might like Government to file. United States v. Alvarez, 115 F.3d 839, 841-42 (11th Cir. 1997)(holding government improperly forced defendant to shoose whether he wanted motion under § 5K1.1 or Rule 35).

---

[2]    Petitioner concedes he told the Court there were no other promises, other then that which is in the plea. However, Petitioner contends the agreement he complains of was in the plea, and counsel was aware of this, and this was Petitioner's understanding.

[3]    Petitioner reserves right to argue improper joinder, if government contends all parties were part of this case, where they were not indicted with Petitioner.

"The proper procedure in this situation is for the government to "determine whether to make a § 5K1.1 motion at the sentencing hearing based on the defendant's cooperation up to that point. If a defendant continues to cooperate after sentencing the Government may elect to file a Rule 35(b) motion for reduction of the defendant's sentence. However, this motion may only reflect assistance rendered after imposition of the sentence." Id. (Emphasis Added).

At bar, Government manipulated the length of Petitioner's sentence by holding it would file a § 5K1.1 motion, and then later a Rule 35, leaving the option to which to Petitioner, if he would cooperate. E.g. United States v. Stockdale, 45 F.3d 1257, 1260-61 (8th Cir. 1995). Notably, government is not allowed to defer consideration of whether to file a § 5K1.1 until after sentencing because a defendant's cooperation is not yet complete, for such strategy "impermissibly merges" the boundries of § 5K1.1 with Rule 35(b). United States v. Drown, 942 F.2d 55, 59-60 (1st Cir. 1991).

Here, Petitioner gave all information he held knowledge about; he told about those he dealt with did, his involvement, the elements of the involvement, and parties he held knowledge about, several being outside the scope of the instant case. Three were prosecuted and convicted by government. Government moved for acceptance of responsibility based on Petitioner's cooperation, PSR at ¶ 6, by it referencing the minimum sentnece under the Guidelines, Sent. Tr. at 24, lns. 19-22 (NOv. 13,

-16-

2002), yet never once mentioned a § 5K1.1 motion for the court's final consideration for substantial assistance. United States v. Martin, 25 F.3d 211, 216 (4th Cir. 1994))Where defendant already rendered what government concedes as substantial assistance, could not defer decision on 5K1.1 on ground it would later make a Rule 35 motion, and a court cannot postpone ruling on 5K1.1 motion, but must rule on it at sentencing). See also United States v. Bureau, 52 F.3d 584, 595 (6th Cir. 1995). And, such § 5K1.1 motions must be determined in a case-by-case basis to the extent and quality of the defendant's cooperation, for government cannot apply the same standard of relief under a Rule 35 later, as it can under a § 5K1.1 at sentencing. United States v. King, 53 F.3d 589, 590-92 (3rd Cir. 1995).

The variances between a 5K1.1 motion and Rule 35 are substantial. Under a § 5K1.1, a court can take into account mitigating factors, like the first time out of Korea, his cultural background and ignorance, in the defendant's assistance to the government, such as the 'safety valve,' while under a Rule 35 the onlt factor that may mitigate reduction is substantial assistance. E.g. United States v. Manella, 86 F.3d 201, 204 (11th Cir. 1996); United States v. Lee, 46 F.3d 674, 677-681 (7th Cir. 1995). Here, government gave no opportunity for such mitigating factors, or whether a § 5K1.1 was adequate. Thus, Petitioner here was prejudiced by government's failure to inform the Court of his assistance and

afford the court, not government, the means to take into consideration mitigating factors for departure below the guideline range, Pwetitioner is now entitled to be resentenced.

Given the foregoing issue, Petitioner's detrimental reliance on government's plea and his understanding thereof, he is entitled under due process and Article I § 10, cl. 1 (impairment of contracts) to be resentenced and the terms applied, and Government perform to the plea agreement, or, in the alternative, right to withdraw the plea and proceed to trial.

II. Assuming, arguendo, the PSR is not part of the Plea Agreement, Then Using Counts II and III for enhnacements, when they were to be dismissed, constitutes violation of Parol Evidence Rule, Where Nothing informs Petitioner these counts would be used to enhance him, within the written agreement.

"Plea agreements are subject to contract-law standards of interpretation." United States v. Kramer, 781 F.2d 1380, 1387 (9th Cir. 1986)(citing United States v. Arnett, 628 F.2d 1162, 1164 (9th Cir. 1979)). A court must determine whether a sentence complies with terms of the agreement by looking at what was reasonably understood by defendant when he entered the plea. Id..

At bar, Petitioner pled to a single count, COUNT I, in exchange that everything in COUNTS II and III be dismissed. Even though the terms afforded these two be dismissed after sentencing, Petitioner understood that nothing in those two Counts would be used against him. Nothing in the written terms of the agreement notifies Petitioner these Courts could be used to enhance him, yet, during sentencing the court relied on

-18-

Counts II and III which Petitioner was promised would not be used against him and would be dismissed. The extrinsic evidence of these Counts was used to give Petitioner an upward departure.

The purpose of the 'parole evdience' rule is to prohibit the very thing that occurred in this case. To prevent factual or other type evidence, that was dismissed by the contract terms, from being used in a different manner against Petitioner. RETSTAEMENT, SECOND, CONTRACTS § 213; 2 FARNSWROTH ON CONTRACT § 7.2 (2nd Ed. 1998).

For the Court to use dismissed, or what was promised to be dismissed, conduct against Petitioner, a two step inquiry must be applied: 1) whether the writing of the plea, as adopted by parties, was the "final expression of one or more terms of the agreement." Where the plea is in writing, its deemed an "integrated agreement," and any terms discharged by the agreement cannot be admissible into evidence in 'contradiction' of the "term of the writing." RETSTATEMENT, SECOND, CONTRACT §§ 209, 215; 2) id there is an integrated agreement, so that parole evidence rule applies, the second prong is whether the writing has been "adopted by the parties as a complete and exclusive statement of the terms of the agreement." If so, its deemed a "completely integrated agreement" and not even evidence of a "consistent additional term is admissible to supplement" it. RETSTAEMENT, SECOND §§ 210, 216; See also U.C.C. § 2-202.

-19-

Here, Petitioner relied, to his detrimental reliance, on the terms of the agreement that all of Counts II and III would be dismissed; that these Counts would not be part of the plea, nor part of his sentence, or used against him. Nothing prepared Petitioner for what was to come, government leaving from the plea vital information. The plain interpretation of the agreement stated everything in these Counts II and III would be dismissed. At sentencing, however, evidence outside of the scope of the terms of the plea was used and Petitioner was enhanced for these two Counts. <u>Seitz v. Brewers' Refrig. Machine Co.</u>, 141 U.S. 510, 35 L.Ed. 837 (1891). Under these type conditions, the judge must develop the record in relation to the terms the plea allows. <u>Santobello v. New York</u>, 404 U.S. 257, 261-262, 92 S.Ct. 495, 498 (1971).

Government would contend the Counts II and III were not to be dismissed until after sentencing. This is true. But the agreement did not forward Petitioner these two Counts could be used to enhance his sentence. The terms of the plea stated: "Counts 2 and 3 will be dismissed immediately upon sentencing." PLEA, at 1, lns. 22-24. Nothing indicates USSG § 5K2.21 (Dismissed conduct) would be used to enhance his sentence, even though the plea does indicate other guideline provisions would be used. See PLEA at 4, ln. 28 (refering to § 1B1.8(a) for assessing punishment). In <u>Seitz</u>, the Supreme Court stated:

> The writing must be the entire contract between the parties if parol evidence is to be excluded, and to determine whether it is or not the writing will be looked at, and if it appears to be a contract complete within itself, "couched in such terms as import a complete legal

-20-

> obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, were reduced in writing.

Seitz, 141 U.S. at 517.

Once the plea was accepted by the Court under Rule 11, the terms became binding and parol evidence rule bound the plain terms of the contract. Those terms dismissed COUNTS II and III. Nothing indicated these counts were to be used to enhance Petitioner, not even in the Rule 11 hearing, but would, in their entirety, be dismissed. Thus, Government breached the agreement and Petitioner is entitled to be resentenced and the § 5K2.21 enhancements taken off his sentence, or the right to withdraw the plea agreement and proceed to trial. See United States v. Ocanas, 628 F.2d 353, 358 (5th Cir. 1980).

        a.    The Plea is based on default rules.

The plea agreement is suppose to be entered by parties of equal status and understanding. Where one party holds more knowledge and understanding, then the other, the one with superior knowledge usually uses that knowledge for his or her own benefit. Plea agreements are such contracts, based on the parol evidence 'default rules,' where prosecution leaves gaps for the court's to interpretate and fill in. Although a defendant may have counsel, if that counsel does not require the plea to be filled in for the defendant's understanding, not counsel's, counsel, in truth, aids prosecution against his own client whom he is to insure holds a knowing and intelligent understanding. As Professors Ayres and Gertner has declared,

this is an unacceptable practice. Yet, courts allow it in criminal cases, while excluding it in civil cases, affording some people a variance in treatment between parties, and a strong possibility of discriminatory practices. These professors stated:

> when one party to a contract knows more than another, the knowledgeable party may strategically decide not to contract around even an ineffecient default. Because the process of contracting around a default can reveal information, the knowledgeable party may purposely withhold information to get a larger piece of the smaller contractual pie. This possibility of strategic incompleteness leads us to embrace more diverse forms of default rules. In particular, lawmakers may be able to undercut the incentives for the strategic [imprisonment]-seeking by establishing penalty defaults that encourage the better informed parties to reveal their information by contracting around the default.

Ayres & Gertner, FILLING GAPS IN INCOMPLETE CONTRACTS: AN ECONOMIC THEORY OF DEFAULT RULES, 99 Yale L.J. 87, 127 (1989).

Like the procedural default rule applied toward defendants, which bars them from relief unless they can demonstrate cause and prejudice, See United States v. Frady, 456 U.S. 152 (1982), prosecution should not be awarded under the default rule for leaving out portions relating to enhancements, he could have easily set forth in the agreement. The default of leaving relevant portions for a full understanding, then using that which was agreed to be dismissed, falls within the realms of fraud, or otherwise, for right of Petitioner to recind and parties be restored to status quo, E.g. Citicopr Real Estate, Inc. v. Smith, 155 F.3d 1097 (9th Cir. 1998), or for specific performance of dismissing COUNTS II and III as the terms integrated.

Where equitable remedies are involved a court must determine the proper method of relief. In this case, however, under Rule 11, a court is

Case 1:04-cv-00039   Document 2   Filed 08/27/2004   Page 22 of 61

suppose to accept the plea as is, and not impose a sentence greater. See United States v. Fernandez, 960 F.2d 771, 773 (9th Cir. 1991). Here, Counts II and III were dismissed as consideration for Petitioner Pleading to Count I. Nothing in the plea informs Petitioner these Counts could be used against him at sentencing, even though Government inserted other guideline portions for enhancement purposes in the agreement. The Court, never explained at the Rule 11 colloquy dismissed counts could be used for Petitioner to enter the plea knowingly and intelligently, then used evidence dismissed, or agreed to be dismissed, to give Petitioner an upward departure. RESTATEMENT, SECOND, CONTRACTS § 214; fransworth on contracts § 7.2. Under the rationale of the parol evidence rule, and default rule, once the terms of the agreement for consideration set that these counts be dismissed, it was error for the Court to use that evidence in any alternative manner against Petitioner. Petitioner now is entitled to have: 1) his sentence reduced, or 2) to withdraw his plea and proceed to trial.

III. Petitioner is entitled Departure For
     Cultural Assimilation.

A claim for relief under the guidelines for reduction, after the fact, falls within the realm of "otherwise subject to collateral attack," under 28 U.S.C. § 2255 where counsel thwarted Petitioner's ability to raise a valid and substantial claim for relief at sentencing. United States v. Meldonando, 242 F.3d 1, 3 (1st Cir. 2001). Stating that, Petitioner's entitled a reduction under the premise of 'cultural assimilation' pursuant to U.S.S.G. § 5K2.0.

Cultural assimilation refers to "family and community ties," as discussed under § 5H1.6, and a district court would be in plain error to exclude that, which the Sentencing Commission did not exclude. United

-23-

States v. Lipman, 133 F.3d 726, 730 (9th Cir. 1998). Although family and community ties usually are not relevant under § 5K2.0, they are "if 'present to an unusual degree" such that the case is distinquished "from the 'heartland' cases ... in a way that is important to the statutory purposes of sentencing."'" Id. at 133 F.3d 730. This case fits that heartland for unusual circumstances warranting departure.

In Korea, drugs are not deemed a large problem, as America has commercialize, and drug arrests are unheard of; furthermore, barely any crimes involve guns. Koreans are taught respect to all persons, and not to create conflict. Elders are especially, and bosses and friends, respected. Their opinions and what they think are highly valued by younger people, and how one portrays themselves in society and to others. To give disrespect to another, falls back upon the family name and disrespect toward the family itself, since family values are highly esteemed, contrary to American standards. Petitioner is taught to treat all people around him with respect, even though they might be rude, tell lies, or mislead, in order to be loyal to friends, family and country. He is to trust and believe their good portion, and taught to treat others like he would want under similar conditions. Unlike America, where one leaves if they believe someone is imporper, Koreans are taught to stay and always be respectfull as it relates to family values, and Korean morals are substantially different, and in many ways, higher in values, for family values in Korea are highly appraised, while America divides families for sake of acclaimed morals.[4]

---

[4]     In today's American society, schools teach children to tell on their parents, so government can arrest them and place them into prisons, and the children into foster homes, because someone disagrees with the "pursuit of happiness" the family has chosen. In America, the teachings are 'you cannot have your right, because it is offensive to me, but I have my right,' shown by the alleged war on drugs, where those using alcohol and tobacco are not imprisoned, even though worse, while those using other drugs are because they offend society, but are less dangerous.

In Korea, the father holds complete responsibility for his children and wife, both financially and emotionally. Petitioner's incarceration has been a hugh blow and disappointment to his culture's family and friends. Moreover, wives, in Korea, do not work, per se, and if they do, they cannot maintain a good paying job because that is the husband's duties. When Petitioner was arrested, and imprisoned, his wife in Korea had to move in with Petitioner's parents. Petitioner's father, now, has responsibility to help her in the Korean culture. When his father died recently, this created a great burden on Petitioner's family because they now have no one to care for them. They must live a poverty life style, even going without food, because Petitioner is incarcerated and the wife is dependent on the husband, who is not present, the wife unable to acquire a working job to pay even reasonable wages.

Finally, in Korea a man or woman does not turn down a favor when requested to perform one by another. At bar, Jae Jun Park requested Petitioner to obtain a rental car. Park had told Petitioner to obtain it because to pay a taxis was too expensive, and he Park could not use his credit cards. The car and cell phone, then were requested by Park toward Petitioner, whom, because of his Korea cultural teachings, held a duty to purchase them. Moreover, Petitioner followed Park's lead because Petitioner had never been outside of Korea before, this being his first trip. EXHIBIT A hereto. When Park spoke with the market owner to rent another room, he had told Petitioner he would come back to Guam and thatbthe hotel he was in was too expensive. Park became irrated easily. Because of Petitioner's cultural upraising he did not continue to ask questions, or interrupt Park's, because he was a close friend and

-25-

Petitioner owed Park respect because of his culture, and so his family name would stay valued.

Additionally, thw white powder of substance from the cans, Petitioner held no knowledge was an illegal substance. In Korea, people give salt and sugar as gifts. The records demonstrates rock salt was substituted for the contents (PSR at 17, SER at 8). Because the substance came in a can, Petitioner believed it was a gift from someone. See EXHIBITB hereto. The overall of Petitioner's cultural background required him to conduct himself in a manner most Americans would have left from, or faught over, or been disrespectful because. The differences in these two cultures, the values and manners, are substantial, and is distinquished from the 'heartland' of the guidelines. Based on the above, Petitioner's lack of actual control over matters, his cultural background, Petitioner is entitled a departure fro cultural assimilation, and is now entitled to be resentenced. See also United States v. Mendoza, 121 F.3d 510 (9th Cir. 1997)(court can depart downward for no control or knowledge over purity of methamphetamine).

IV.     Petitioner Informed His Counsel, and the
        Interpretor, He was Actually Innocent,
        And Counsel Having Petitioner Plead
        Guilty Constitutes Subornation of Perjury.

        Title 18 U.S.C. § 1622, states:

            Whoever procures another to commit any perjury is guilty of
            subornation of perjury, . . .

18 U.S.C. § 1622 (West, 2000). The essential elements of subornation of perjury are: 1) testimony to be suborned witness or person must be false and known by him to be false, falsely testified to; 2) suborner must know or believ testimony of witness or person is given will be false, and intend

-26-

the witness or person to give testimony corruptly or with knowledge or belief of its falsity. See Boren v. United States, 144 F. 801, 75 C.C.A. 531 (9th Cir. 1906).

Here, Petitioner was a foreigner, in a foreign land and who does not speak english. He lacked a high school education. Petitioner lacked knowledge of the laws, and was dependent upon those holding superior knowledge to himself, and the ability to guide him. Thus, Petitioner relied upon the court appointed counsel and the interpretator to correctly and properly advise him. He had instructed both he was actually innocent of the charges against him. See EXHIBIT B hereto.

Here, however, Petitioner's counsel was repeatedly instructed by Petitioner he was innocent. That Petitioner did not know what was transpiring and had not anything wrong. However, with the 'plead-em-guilty' attorneys coming out of law schools today, and their low pay[5], attorney's

---

[5]     Criminal defense systems are in "a state of perpetual crisis." Stephen J. Schulhofer, et al., RETHINKING INDIGENT DEFENSE: PROMOTING EFFECTIVE REPRESSENTATION THROUGH CONSUMER SOVEREIGNTY AND FREEDOM OF CHOICE FOR ALL CRIMINAL DEFENDANTS, 31 AM.Crim.L.Rev. 73, 74 (1993). "The evidence is unambiguous and telling. Lawyers representing indigent defendants often have unmanageable caseloads that frequently run into the hundreds, far exceeding professional guidelines. These same lawyers frequently receive compensation at the lowest end of the professional pay scale." Note 113 Harv.L.Rev. 2062, 2064 (2000). Most estimates demonstrate 80% of all criminal defendants are represented by indigent defenders. The "skill of indigent defense counsel is thus essential to quality truth-seeking in most criminal cases, and fundamentally affects the legitimacy of the system." REPORT OF THE ATTORNEY GENERAL"S COMMITTEE ON POVERTY AND THE ADMINISTRATION OF FEDERAL CRIMINAL JUSTICE 5-11 (1963)(Often called 'The Allen Report'). "Nationwide, we spend more than $97.5 billion annualy on criminal justice. More than half of that goes to the police and prosecution, who together investigate, develop and prsecute cases. Indigent defense, by contrast, receives only 1.3 percent of annual federal criminal justice expenditures. The national average per capita spending on state and local indigent defense in 1990, the latest year for which figures are available, was $5.37." David Cole, NO EQUAL JUSTICE 64, 64-65 (1999). And, "nearly 70% of the nation's population lives in jurisdictions served by public defenders." Floyd Feeney, et al., PUBLIC DEFENDERS, ASSIGNED COUNSEL, RETAINED COUNSEL: DOES THE TYPE OF CRIMINAL DEFENSE COUNSEL MATTER?, 22 Rutgers L.J. 361, 363 (1991). It is little wonder defendants are required to commit perjury when they claim actual innocence.

across America plead defendants guilty rather then proceed to trial, even though they assert their actual innocence, and if they withdraw because of their innocence, the defendants are enhanced for obstruction of justice. See United States v. Nelson, Case 00-CR-0410-JP (USDC NM 2000)(Defendant told to plead even though instructing counsel of actual innocence, then withdrawing and receiving enhancement for obstruction of justice).

Petitioner made plain to counsel he was actually innocent. Even though counsel knew this, because of his unmanageable caseload, he instructed Petitioner to plead guilty. Counsel wilfully and corruptly knew his instructions to Petitioner would cause him to make a false statement the testimony was false and Petitioner's statements to the Court during the Rule 11 colloquy would be false, and intended Petitioner plead guilty, knowing it to be false.

At bar, Petitioner relied on counsel's advise and pled guilty, even though he had told his counsel he was actually innocent. After coming to prison, Petitioner learned this was improper advise for counsel to a defendant that claimed his innocence, and Petitioner challenges it under this § 2255 motion, where his plea was involuntarily induced by counsel's representation. Counsel's conduct deprived Petitioner of his Fifth Amendment right not to plead guilty, and his Sixth Amendment right to demand a jury trial, solely because counsel sought Petitioner to plead guilty even though he asserted his innocence. Furthermore, counsel instructed Petitioner to instruct the court he was "actually guilty," even though Petitioner asserted his innocence. Thus, Petitioner is entitled to have his criminal prosecution reinstated, and relief afforded in this § 2255 action. See United States v. Silverman, 745 F.2d 1386, 1394-95(11th

-28-

Cir. 1984)(Fixing guilt and not informing court of perjury). See also United States v. Walker, 148 F.3d 518, 526-28 (5th Cir. 1998).

V.      Petitioner received ineffective assistance
        of counsel.

        Ineffective assistance of counsel claims are the exception to tha rule that issues nor presented on direct appeal cannot be raised for the first time in a § 2255 action. See United States v. Galloway, 56 F.3d 1239 (10th Cir. 1995). See also United States v. DeRewal, 10 F.3d 100, 101 (3rd Cir. 1993)(holding "cause and prejudice" standard does not apply to ineffective assistance of counsel claims asserted in § 2255). Having stated that,

        The failures of Petitioner's counsel are substantial, and outlined in EXHIBIT B hereto. A listing of those failures include:

        1. The failure to retain investigators as necessary to collect defense evidence and impeachment evidence of the Government's case to discredit their testimony, show Petitioner had never been out Korea before, and was a first time aberrent behavior for jury.

        2.      Failure of counsel to inform the Cour that Petitioner asserted his innocence and that counsel was having Petitioner plead guilty to an offense he claimed his innocence too, knowing he was having Petitioner perjure himself and commit a crime.

        3.      Not searching out evidence to support Petitioner's claim of innocence; where the car rental lady could have testified that Park's requested Petitioner pay because Park's credit cards were invalid.

        4.      Failure to argue for aberrent behavior, and/or cultural assimilation regarding a downward reduction at sentencing, based on Petitioner's first time offense, and his cultural background.

        5.      Failing of counsel to argue contract law of parol evidence, where evidence outside the written agreement was brought into the sentencing scheme contrary to the terms of the contract.

        6.      Counsel failed to obtain evidence that Petitioner had never been outside of Korea before, lacked the funds to travel, and only because of Park purchasing a ticket, was he able to go to Guam at Park's request.

-29-

7. Counsel failed to obatin information from Petitioner's family regarding the ticket being purchased by Park as a wedding gift, but only enough for Petitioner, not his wife also, which would have helped support Park was using Petitioner.

8. Counsel failed to contact witnesses, like the apartment landlord, who could have testified Petitioner questioned Park on the rental of additional apartments, above the market place, and to show Park became agitate at Petitioner when questioned.

9. Failure of counsel to argue that enhancement above the base offense level, where guidelines have been held to be statutes in United States v. R.L.C., 503 U.S. 291, 298 (1992), based on the holding in Apprendi v. New Jersey, 530 U.S. 466 (2000), where the facts were not proven by a jury beyond a reasonable doubt.

10. Counsel's failure to object to enhancements that were not set forth in the Plea Agreement writing, as constituting parol evidence and a violation of the default rule by prosecution, the terms of the writing be the impact of the agreement and the court failing in its colloquy to inform Petitioner of any enhancements that would be used outside the written plea.

11. Appellant counsel's failure to send Petitioner his paperwork in a timely manner, while he filed to withdraw, so Petitioner could move for rehearing to the Ninth Circuit, instead of waiting and causing Petitioner prejudice by denying him to file for review.

12. Appellant counsel's failure to forward paperwork, while the Ninth Circuit decided his motion to withdraw and for new counsel, which caused Petitioner to be late for filing any review in the Supreme Court by writ of certiorari due to Appellant counsel's neglect and lack of concern for Petitioner right to file said writ.

Both trial counsel and appellant counsel's failure to notify the courts that Petitioner asserted his innocence, and Appellant counsel's failure to notify the court Petitioner claimed his innocence and trial counsel William Bischoff pled him guilty by one claiming his innocence.

Since Strickland v. Washington, 466 U.S. 668 (1984), the law on ineffective assistance of counsel has favored the incompetent attorney by requiring defendants to show not only that his counsel's performance fell below an objective standard of reasonableness, but also that there is a reasonable probability that "but for" his counsel's substandard performance he would have prevailed.

However, in this case, just the facts that counsel pled Petitioner

-30-

guilty when Petitioner asserted his innocence on a repeated basis, constitutes ineffectiveness. Woods v. Nierstheimer, 328 U.S. 211 (1946). Here, counsel told Petitioner he could never win; that if he did not plead guilty he would receive 25-30 years in prison, but if he pled only 2-3 years. Here, like the agents and prosecution, counsel kept instructing Petitioner he would sit a long time in jail if he did not plead, even though Petitioner asserted his innocence. And, knowing Petitioner claimed his innocence, instructed Petitioner to tell prosecution a story to obtain relief, and lie to the court. Silverman, 745 F.2d 1394-1395. Add that to counsel's inattention to inform the court Petitioner claimed his innocence; and instructing Petitioner to assist prosecution and not seek evidence to impeach in Petitioner's favor, indicates that counsel was not prepared for trial and that Petitioner did not receive the undivided loyalty he was entitled to in the defense of his case. Glasser v. United States, 315 U.S. 60 (1942). Even Strickland requires a counsel to consult with a defendant on important issues regarding any plea agreement, 466 U.S. at 688, and that counsel should not have any conflict of interest. 466 U.S. at 692-93.

The Petitioner's pleas are rendered involuntary by the ineffective assistance of counsel; that is, but for his counsel's deficient performance, Petitioner would not have pleaded guilty to the offenses charged in the indictment. Hill v. Lockhart, 474 U.S. 52, 59-60 (1985). Defense counsel's request for Petitioner to plead guilty, when he claimed his innocence, were not those of a bumbling inexperienced attorney. The failure to communicate, to notify the court, was intentional. EXHIBIT B hereto.

It was unreasonable to require Petitioner to plead to an offense

-31-

he claimed he was innocent of, and it makes counsel ineffective to force Petitioner to proceed on those basis.

Petitioner was entitled to be represented, not convicted, by his counsel and is now entitled a new trial.

## CONCLUSION

For the foregoing reasons, Petitioner requests the Court grant him relief from judgment. The evidence presented herein demonstrates that Petitioner's prosecution was totally deficient of all and virtually all constitutional protection and that continued incarceration constitutes a manifest injustice. As a result, Petitioner requests that his conviction be vacated and that the Court (1) declare him innocent, and/or 2) find that he is entitled to the vacation of his conviction and that the ineffectiveness of counsel was so severe that Petitioner is now entitled to be retried.

Dated this ⟍⟋ day of August, 2004.

Respectfully submitted,

BY: _____
JIN YEONG HWANG
Defendant-Petitioner, Pro se.

GWS/cc:

-32-

EXHIBITS

EXHIBIT A
(Letter from Consulate as to travel abroad)
(Affidavit  of Jumrae Lee)

CONSULATE GENERAL OF THE REPUBLIC OF KOREA

1990 POST OAK BLVD., SUITE 1250
HOUSTON, TEXAS 77056-3812
TEL (713) 961-4866   FAX (713) 961-3340

Wednesday, June 16, 2004

To Whom It May Concern:

Upon the request of Mr. Jin Yeong Hwang, Korean national born on November 11, 1968,
I am writing to confirm the record relating to his departure from Korea. According to the
computer records of the Korean Immigration Office, Mr. Hwang left Korea on December
16, 2000 for his first foreign trip abroad.

If you have any questions as to the above information, please do not hesitate to contact
me at 713.961.0186, ext. 204. Thank you.

Sincerely,

Bon-yul Kou
Consul

# Affidavit of Jumrae Lee

I, Jumrae Lee, being duly sworn according to law, hereby deposes and states:

## I.

I am the deponent in this affidavit; that I reside at 7675 Aspen Park, in San Antonio, Texas; that I am a housewife, and am acquainted with Hwang Jin Yeong since childhood years as a cousin. My mother and Hwang Jin Yeong's mother are sisters.

## II.

I know from many years' experiences that Jin Yeong had never been out of Korea before, and it was his first trip to Guam; that he worked daily to support his family, never having much money.

## III.

I know Hwang Jin Yeong had never been involved in drugs. It is almost impossible to get involved or purchase any drug in Korea. Hwang Jin Yeong was lacking knowledge of drugs; that he was allowed other to mislead him ignorantly. When he was in Guam, he did not know what he got himself into; that only thing he was thinking about was going back home.

## IV.

I am willing to testify to the above if the court deems it necessary; that I write this in the interest of justice and family needs.

## V.

That further sayeth naught.

Jumrae Lee

7675 Aspen Park
San Antonio, TX 78249

---

**Notarization**

State of _Texas_

County of _Bexar_

BEFORE ME, the undersigned authority, on this day personally appeared

_Jumrae Lee_ who, after being duly sworn by me, upon oath did state

that the information contained is true and correct.

SWORN TO and subscribed before me this _21 st_ day of _June_ A.D. _2004_

_Jumlee_ _6/21/04_
Signature of individual completing affidavit     Date

KATHERINE LYNN PASCUAL
NOTARY PUBLIC
STATE OF TEXAS
MY COMMISSION EXPIRES 05-05-2008

_Katherine Lynn Pascual_
Notary Public

My commission expires _05 - 05 - 2008_

EXHIBIT B
(Declaration of Jin Yeong Hwang)

I, Jin Yeong Hwang, a.k.a. Hwang Jin Yeong, being duly sworn according to law, do hereby depose and say:

I.

I am the deponent in this matter; that deponent is presently serving a term of incarceration of 168 months at the Federal Correctional Institution, Big Spring, Texas, amd deponent resides at the same.

II.

That deponent was represented in the case of <u>U.S.A. v. Hwang</u>, No. CROO-00150-002, by defense counsel William Bischoff, of Suite 501C GCIC Building, 414 West Soledad Avenue, Hagatina, Guam 96910, phone: 601-477-2301; that deponent told counsel he was 'actually innocent' of any wrong doing, and did not know what was occuring; that deponent instructed counsel as to events, to his best ability, which events were as follows:

Deponent lives in Korea, and has never been outside of Korea in his lifetime. As a child, deponent watched an American movie on television; that the movie dramatized tattoos, and because of this movie, deponent and some childhood friends obtained tattoos. In Korea, tattoos are taboo and as deponent got older, he sought to have them removed. Although some that were visible were removed, leaving scars, others remained. That deponent has never transacted in illegal activity, and held no knowledge of drugs.

The only reason I went to Guam was because of an old friend, Injong Park, who told deponent to go there for a vacation. Park introduced deponent to his friend, Jaejun Park, just shortly before deponent left for Guam. Injong Park told deponent Jaejun Park was going to Guam soon,

and requested deponent go with him. That deponent wanted his wife to go along, but because of stress and anxieties and a small argument deponent and his wife had, deponent went alone. Injong knew about this argument and suggested deponent go to Guam to relax and relieve the stress.

Deponent had gotten married on October 28, 2000 in Korea. When deponent got married, Injong tried to give tickets for an international trip for a wedding present, but because deponent and the bride had a delay in receiving a passport, it was cancelled. Deponent took the ticket to Guam as a make up wedding gift, and because Injong was a long time friend, deponent had nothing to doubt, trusting him in all things.

On December 16, 2002 deponent departed Korea for his first trip outside the country. At the airport deponent was asked "why did you purchase an open ticket?" Deponent held no knowledge what an open ticket was because Injong had obtained the reservations and gave the ticket to deponent. When requested how long deponent intended to stay, deponent replied about one week. They set up dates and instructed deponent he had to depart Guam within those dates.

After leaving the gate, deponent witnessed Injong getting a rental car. He told deponent taxis were to expensive in Guam, and that we also needed a cell phone. When Injong attempted to obtain the car and phone, he told deponent he could not use his credit cards. Deponent had a credit card his wife had given for emergency use, and Injong asked to barrow it, stating he would pay deponent back later. The land, things around deponent memorized him, everything seeming new, different, deponent held no knowledge of what to do. Jaejun told deponent he held a immigration green card, and since he had been to many other countries, deponent

AFFIDAVIT OF JIN YEONG HWANG, PAGE TWO

felt Jaejun knew what he was doing.

At the rental car location, at the airport, there was a Korean lady who could have testified that Park had deponent rent the car because Park's wanted a cell phone and without a valid credit card could not obtain it; that Park's requested, before this lady, deponent pay for both with his wife's credit card. To deponent's knowledge and belief, this lady was never interviewed on this matter by counsel in this case..

After having obtained the rental car and cell phone, deponet and Jaejun exited the airport, Jaejun drove the car to the hotel; at the hotel Jaejun obtained a room, but then suddenly cancelled everything, stating to deponent it was "to expensive," and we went to another hotel, name the "Palace." By the time deponent arrived at this hotel, from the air trip, and everything, he was extremely tire, and fell asleep, not waking till the next day at noon; Jaejun told deponent he had to go someplace, and deponent fell asleep again believing Jaejun had to get something; Jaejun came back with a Korean newspaper (local), and after eating together, Jaejun told deponent he was going to look for a room he needed; deponent believed, in good faith, Jaejun wanted to stay in Guam, or come back later, for his business, or something else legal.

Jaejun, with deponent, went to Jaejun's apartment, where Jaejun spoke with his Korean landlord; deponent heard Jaejun speaking that he wanted to remain in Guam, and handed the Korean landlord some cash; instructing her he needed the address because he was to receive some mail being shipped from another location; when Jaejun obtained the address, he gave deponent the address to keep on him; deponent held no knowledge of what Jaejun was doing, but never thought the matter a big deal,

AFFIDAVIT OF JIN YEONG HWANG, PAGE THREE

believing the matter was for his privacy.

When deponent and Jaejun returned back to the hotel, deponent told Jaejun he was getting bored, and wanted to go touring, or do something, since he was on vacation; Jaejun did not seem to interested in touring, and deponent believed it was because he had already been in Guam at these locations; deponent kept requesting Jaejun to go out, and we both, finally, went for a drive. On or around this time, deponent begun to feel sick and could not even eat; deponent was having tonsillitis, and believes it was due to the sudden weather change from Korea to Guam; deponent went to the hospital in Guam, and when he filled out the paperwork, wrote his name as "Min-su Kim," which is deponent's nickname in Korea.

After receiving medication, and deponent beginning to feel better, deponent located a shooting range in the newspaper and, since deponent was bored, was interested in it and requested Jaejun to go to the shooting range with him; deponent recalls giving tips to the employee there, who was also a witness in the investigation at the time deponent was arrested, and to deponent's knowledge was never interviewed by counsel on any matter. When Jaejun and deponent were at a Korean market place, deponent heard Jaejun asking the market owner if there was a room; the owner telling him there was one above the market; deponent could not understand and asked "Why are you getting another room,?" in which Jaejun told deponent, irritated from deponent's questions, that when he cam back to Guam, the hotel would be to expensive; at the time deponent held no knowledge of what Jaejun was up too, and deponent, because of friendship, did not want to hurt his feelings by interrupting him, not wanting to ruin our friendship; during the entire trip deponent was giving thanks to Injong for the free vacation gift.

AFFIDAVIT OF JIN YEONG HWANG, PAGE FOUR

Jaejun gave some money for the room, then Jaejun took deponent to K-Mart to purchase some items; deponent recalls Jaejun purchasing a can opener, blankets, and a rice cooker. Deponent assumed Jaejun needed the items later, or something. When we returned to the room, Jaejun had just obtained, the cell phone rang, and Jaejun made deponent answer it, but it was in english; the call was from DHL, so deponent informed Jaejun; the call was to inform Jaejun his mail had arrived, and jaejun requested deponent to go and check for him; since the place was less then 10 minutes from the room, deponent didn't believe there was any problem.

When deponent arrived at the location, the owner was preparing to leave; deponent asked her if any mail had arrived, but she stated none had; she gave deponent the key to her home and instructed deponent to wait for the mail; deponent sat inside the empty home until a DHL person came; the DHL person stated something in english, but deponent could not understand; deponent believes he might have asked if deponent was Minsu Kim, and thought he might ask for an I.D. for Min-su Kim; deponent had not known til this time that Jaejun had ordered the mailin deponent's nickname; deponent attempted to inform the DHL person he had no I.D. for Min-su Kim, but had difficulty stating it in english; deponent just believed he had to obtain the mail for Jaejun, and tried to tell the DHL person he was my brother so he would give it to deponent for Jaejun, but did not know whether he understood or not; deponent also tried to tell him he could  go get Jaejun, who could speak english better, but the DHL person just asked deponent to sign the paper and gave the package.

Deponent placed the package into the car and drove back to Jaejun; driving back, Jaejun called deponent and instructed deponent to come to the Korean market under the place where we were staying; Jaejun stated

he would be out front waiting for deponent and seemed worried whether deponent had 'done well;' deponent felt used and had begun wondering 'why is he making me do all these things,' but deponent never stated anything because of friendship and deponent's cultural upbringing; deponent attempted to convince himself Jaejun was trying to make deponent learn the new environment and the language.

When deponent and Jaejun returned to the room, Jaejun opened the box while deponent was in the restroom; when deponent came out from the restroom, cans were lying on the floor, which had been in the box; deponent requested Jaejun want the cans were, and Jaejun stated "something important to me," and that deponent didn't need to know; deponent was offended that Jaejun gave such an ignorant answer, but didn't ask further; Jaejun opened a can and deponent saw white powder taken out of the can; in Korea people offen give salt or surgar as a gift, so deponent believed the white substance was either salt or sugar and that Jaejun had received a gift from someone.

Jaejun requested deponent to find a bar from the newspaper, and deponent did; as Jaejun was getting ready, he asked deponent to come to meet his friend; Jaejun requested deponent to drive, and deponent told him he was not familiar enough with Guam to drive, but since Jaejun didn't listen to deponent, deponent drove for him; by this time, deponent was getting tired of continuously doing things for Jaejun, without consideration in return, but strived to have patience since the trip was not long before deponent would go home to Korea.

Deponent remembered Injong gave deponent a phone number to give to Jaejun when he asked for it, so deponent gave it to him; Jaejun stated

the number was for Jung-yong Park's number and that it was a friend of Injong and Jaejun; deponent didn't know Jung-yong, but Jaejun asked deponent to call him and tell Jung-yong Park to come to the bar; then deponent and Jaejun went to the bar and waited for Jung-yong to arrive.

Deponent and Jaejun was on the second floor where there was pool games being played; that deponent was kind of hungry and deponent ordered some noodles; Jaejun looked nervous as he continued to watch his watch, and Jaejun kept asking deponent to look outside to see if anyone was there; deponent looked out the window, but never saw anyone, and Jaejun requested deponent call Jung-yong. When deponent did, Jung-yong told deponent he was at the wrong location, the names being familiar, and he'd be at the bar in about 10 minutes, and would be wearing a red shirt.

After deponent finished eating, deponent went outside for a cigarrette; in the parking lot deponent saw someone wearing a red shirt, a hat, and a suitcase; as the person came toward deponent, he stopped and quickly ran away; being as it was dark, deponent was unsure if it was the right person and tried to follow the person, but he had disappeared; deponent stood for a minute or two, looked around the parking lot, then went back inside and told Jaejun what he had witnessed; Jaejun didn't believe deponent.

After deponent and Jaejun returned back to the apartment, deponent heard noises from the back and saw officers trying to arrest deponent and Jaejun; deponent, having never been in trouble, was shocked, and kept thinking that "this must be a mistake, I haven't done anything wrong;" the officers separated deponent from Jaejun and begun to ask questions, but deponent was unable to understand what they were saying; the officers gave deponent a paper to sign, which was in english and he could not read

the document; the officers then gave deponent a document in Korean, but deponent was extremely confused about the situation and held no knowledge of what was actually going on, besides deponent being somewhat inebriated; the officers continued to ask deponent to sign the document without reading it.

Both deponent and Jaejun were arrested, and taken to the police station. Up till this point deponent was unsure what was going on, but finally realized that Jaejun and Injong has used deponent's friendship to 'set-him-up,' taking advantage of deponent's friendship; deponent strived to recall what had happened and, only at this time did things begin to make sense, deponent being used for everything Jaejun has asked him to do, and felt deeply hurt, angry, and heartbroke that Jaejun and Injong would use deponent as they had, and gotten deponent into a situation he held no knowldge of; deponent knew he needed someone to help him out of the trap his 'friends' had set him into.

Aroun this time deponent met his lawyer, William, and a Korean interpretator, right before going to court; the translator instructed deponent to answer "yes" if anything happened in Guam was correct; when they questioned, as they instructed, deponent answered yes as toward places he had been and so on, and because it sounded correct, he stated 'yes' as he'd been instructed; after that, deponent was placed under investigation for a while, the lawyer and interpretator asking why deponent had come to Guam and deponent kept trying to prove he was innocent, but deemed it was useless because he didn't know how to prove it and the lawyer and interpretator didn't seem to believe him..

Although deponent continued to instruct the lawyer (counsel) he was actually innocent of any wrong doing, the lawyer kept telling deponent

AFFIDAVIT OF JIN YEONG HWANG, PAGE EIGHT

if deponent would not plead guilty he would end up with 25-30 years in prison; the lawyer kept asking deponent for more information, and deponent kept telling the lawyer the truth, but the situation was far worse then deponent had thought; the lawyer (William) instructed deponent to tell "who you work for," and that deponent would only receive 2-3 years; deponent could not understand why the lawyer kept asking this since he had already told him the entire matter, and deponent held no knowledge he had been working for drug dealers, nor who was behind everything. The Korean Interpretator also instructed deponent if he would plead guilty, he would get only 2-3 years.

Deponent was taken to a Korean F.B.I. agent; deponent told the agent the entire story and the agent told deponent that, "in America, it is still guilty even if you didn't know what you were doing," instructing me to the same things the lawyer has stated and recommended deponent plead guilty so deponent would not recieve a 25-30 years sentence; deponent was in dire straits, because no one listened to the fact he was innocent, and followed the lawyer's advise, believing he had no other choice.

Although deponent had informed the lawyer he was actually innocent, the lawyer told deponent to plead guilty and to accept guilt; the plea agreement was written in english and deponent did not understand it, except by the translator; deponent wanted the document in Korean so he could read it and fully understand the agreement but it was not allowed deponent to have this right; the translator read the agreement, but deponent did not know at that time it was read only generally and only portions were told deponent; everything was done so quickly; deponent was in such a state of acute distress that all this was occurring in America, and deponent held no knowledge of American law; deponent kept thinking:

AFFIDAVIT OF JIN YEONG HWANG, PAGE NINE

"Why do I have to be guilty as a drug dealer when I had no idea of what was going on ... I still don't understand."

Deponent went to court to admit guilt; deponent never understood why he would admit guilt when he claimed his innocence, but followed the lawyer's advise, the lawyer stating deponent had too; deponent listened to the translator during this proceeding and heard things new he had never been told before, and deponent stopped answering; deponent was being told new stories he had never heard of and even names he had never heard of, and deponent could not accept the information; at this time the lawyer and translator came over and told deponent that if deponent changed his mind the judge would not like it and it would have a negative impact on deponent; that deponent should accept the agreement and tell the court yes, even if deponent did not agree with it; deponent hesitated for moments, and believing he could not make a choice because of what the lawyer told him, and the translator, deponent accepted the lawyer's advise and proceeded on; deponent could not believe he had to plead to something he was actually innocent of, but did what the lawyer instructed me to do.

The Korean FBI agent instructed deponent that it would be helpful if deponent could locate someone to take custody, but deponent knew noone in Guam; deponent began searching and found a Korean pastor who came to the prison (jail) each week for bible study and deponent asked him for help; te pastor introduced deponent to Thomas Park (Korean name is Chang-Yeon Park), who was attending the pastor's church; after seven (7) months in custody, deponent was released into Thomas's custody.

Deponent stayed at Thomas's home under probation; each week deponent had to contact the F.B.I. to report how things were going and also the probation Office; deponent gave thanks to Thomas and the pastor for being

AFFIDAVIT OF JIN YEONG HWANG, PAGE TEN

out of jail, and deponent began to belief, for the first time in his life, in the Creator, believing things were going to be better; deponent enjoyed going to church and helped church fellowships in small and big sthings that deponent could do to his best ability.

Deponent's lawyer contacted deponent to instruct him that the date of sentencing was approaching and that deponent needed to speak with the Probation Officers regarding events. When deponent went to the Probation Officer's office, the lawyer did not show and deponent was left to try to defend himself without any legal advice. The Korean Interpretaor was present, who was not a lawyer. The probation officer questioned deponent regarding his family, occupations, inter alia. Deponent instructed the interpretator and the probation officer his nick name in Korea was "Minsu Kim," but when the Presentence Investigation Report was sent (which was sent to deponent's family in Korea), the report never stated anything about my nick name. Probation, nor the interpretor, at no time questioned deponent regarding events in Guam and deponent found out later the lawyer instructed them not to ask any questions on this matter, or probation would have found deponent claimed his innocence.

The Lawyer, William, told deponent that deponent could get up to 10 years in prison; the lawyer continued to instruct deponent he needed to give government more information to receive a shorter term of imprisonment. Deponent asked Lawyer William's, "how am I suppose to give information that I don't know? Do you want me to lie or something?" The lawyer did not answer my question, and turned and restated deponent needed to give more information, even though deponent had told lawyer William deponent was actually innocent of the crime charged. Deponent,

based on the lawyer's statements, his unwilling to believe deponent's innocence, began to think he needed to locate someone else to help him; deponent contacted his wife in Korea and told her he needed a lawyer; although she does not have much money, she used her credit card to barrow approximately $10,000.00 and send to deponent, which she would be willing to testify too.

Deponent, being a foreigner and not able to properly speak english, and because of his custody status, Thomas Park knew about the funds and took the funds from deponent so deponent could not obtain a new lawyer; Thomas instructed deponent he had it in a "safe place," but refused to give the money to deponent when deponent asked for it, and then begun to avoid deponent. Deponent paid Thomas $500.00 per month for rent while he stayed their for five (5) months, along with doing house work; and believes Thomas needed money; deponent further found Thomas lied to the probation officer by telling negative things about deponent that were not true so deponent would be placed back into official custody, that way Thomas would not need to return the money. Thomas took deponent to probation to report; deponent felt the air was different before deponent walked into probation, people looking and treating deponent differently. They separated Thomas and me and ran a urinalysis test, and deponent saw Thomas speaking to employees. Deponent knew things were wrong, but had no means to overcome them.

Deponent found out later Thomas had cancelled being deponent's custodian at that time frame; that we were to speak to a new lawyer at the probation office; Thomas went to obtain the money, leaving the building; he left me, the attorney, and never showed again; I was thinking about contacting the police, but first, I was arrested, second,

AFFIDAVIT OF JIN YEONG HWANG, PAGE TWELVE

deponent felt the pastor would be involved who helped him and did not want to hurt the pastor; deponent does not know whether the pastor was involved with Thomas, or not, but, when deponent saw the pastor in the jail, the pastor ignored deponent. Deponent could not understand how they could use someone who was already in trouble, and that deponent's life seemed to have taken a twist for the worse.

Deponent was to have come to Guam only for a short vacation to rest and relax; now deponent was charged in a foreign land with events he had never been involved in; that deponent's lawyer would not believe deponent of his actual innocence; deponent never felt so betrayed, so loss, in all deponent's life, and no one, in a land preaching freedom for all, would believe deponent or was on deponent's side; not even the lawyer; deponent missed his family extremely, and wept much because of events with deponent's wife before he left, who had only been married a few months to deponent; deponent had many regrets, felt lost and on many occassions wanted to die; the greatest regret was coming to this country of America, where it preaches justice, but none exists.

About this time frame deponent's brother came to Guam because they had heard deponent was not in very good shape; when deponent saw them, his hopes seemed to revive again; when they heard that the money had been stolen by Christians, they barrowed the money again and sent it to deponent and deponent hired Howard Trapp. When Attorney Trapp came, he had an interpretator with him, as deponent expected; deponent told attorney Trapp about his situation and he stated deponent's sentence would not be more than 10 years, and everything would be fine; attorney Trapp instructed deponent he could possibly receive an even shorter sentence since deponent didn't know what he was doing, and somebody else

was behind everything; Attorney Trapp informed deponent to look for a new custodian so deponent could stay outside until sentencing. Deponent began believing a new light might have come forth, but then attorney Trapp began asking for information like lawyer William and the F.B.I. agent repeatedly asked, even though deponent continued to assert his innocence; deponent wish he actually had information, but deponent was truly the 'scape goat' in others game of chess.

Attorney Trapp told deponent deponent had teh choice of choosing between 14 years and a 25-30 year sentence; deponent was speechless; and again believed his situation had no hope, and deponent cried out for help, but attorney Trapp instructed deponent it would be difficult to change the guilty plea lawyer William had deponent plead too and that deponent admitted under lawyer William's advise, and deponent certainly would not win his case.

Deponent appeared for final sentencing, and received a fourteen year prison term; deponent thought he was dreaming, couldn't believe nor accept it; attorney Trapp told deponent that if deponent claimed his appeal rights, that deponent's chances were about 80-85% for winning, which deponent believed was good odds; attorney Trapp than requested more money for both him and the translator, which was a lot; attorney Trapp mentioned the change in law and that it was based on the factor deponent was not the one who gave orders; deponent paid the fees requested, not recognizing that included labor (hourly rates) until deponent's brother saw the contract in Korea and informed deponent about it, which made costs higher then what deponent expected; deponent tried to redo the contract, but attorney Trapp would not change it, deponent not understanding all terms.

After deponent moved from several prisons, after being sentenced, deponent arrived at the FCI Big Spring, in Texas; deponent was unable to speak with his lawyer because of being moved place to place; deponent wrote his story, sent it to attorney Trapp, and waited, then received a letter from the court which informed deponent his case was not reasonable enough to win; deponent tried contacting attorney Trapp, but was unable to speak to him, no translator was available, so deponent could not communicate and deponent believes the secretary stated the case was over; when deponent finally got to speak to attorney Trapp again, he requested another extremely high price and it was extremely difficult to understand for deponent since there was no translator to intervene; attornet Trapp just stated he lost contact with her (translator), and that deponent could not proceed because deponent had no more money.

Later, deponent received a letter from the court stating his time for filing was over and his 90 days had lapsed; deponent regrets much coming to American lands, and deeply regrets having such a friend, whom deponent trusted deeply, that used deponent and got him into this mess; the entire matter seems like a dream, except deponent sits imprison and unable to see his loved ones, thousands of miles away.

III.

Deponent's counsel on appeal filed for dismissal and appointment of new counsel; deponent had requested he file for a rehearing, and then for a certiorari; by the time counsel and the appellate court played games, deponent was unable to file his writ of certiorari to the Supreme Court to see if they would hear the matter.

AFFIDAVIT OF JIN YEONG HWANG, PAGE FIFTEENTH

IV.

Deponent was informed by lawyer William to tell the Court he was guilty, even though deponent had told said lawyer William he was innocent of the charges against him; that the plea lawyer William had deponent sign stated the charges would be dismissed, and deponent was never informed they would be used against him to enhance his sentence; that even the plea does not state the sections of any guidelines to enhance for dismissed conduct; that deponent believes the plea agreement is an 'adhesive contract' based on superior knowledge over deponent. That deponent was actually innocent of the charges and lawyer William had deponent lie to the Court, and plead guilty, even though deponent was not.

V.

That deponent held no knowledge of the American law, nor of courtroom procedures and protocols; that deponent was under the guidance and instruction of his attorney(s), for they were to know the laws; that deponent would never had pleaded had he known he was committing a crime by pleading guilty when he was innocent, but no attorney instructed deponent to tell the court he was guilty when he claimed his innocence was illegal, lawyer William telling deponent to tell the Court he was. That had deponent known he could receive more time for perjury.

VI.

Attorney Trapp did not pursue any claim for reduction under deponent's culture, which deponent is told is able to be given; that had attorney Trapp requested deponent to tell about his Korean culture and family, the following elements would be related:

AFFIDAVIT OF JIN YEONG HWANG, PAGE SIXTEEN

In Korea the people (children) care for their parents; children do not place their parents in old folk homes as Americans do, the children having a duty to care for them. Korea is a patriarchic nation, with everything centering on the father or husband, who is the highest authority in the household. In Korea, it is accustomed and believed that parents have the right to hit their children because it makes them better children; Korean people are extremely obediant to their parents.

Children in Korea learn friendship and comradeship; contrary to the teaching of tattling Americans are taught; and taught to have respect for their kindred; younger brothers and sisters are taught by the parents and older broethers and sisters respect and courtesy, the older being examples. If one faces a problem, they all help each other.

In Korea. the people believe an elder deserves respect from the youth, unconditionally. If someone doesn't show respect to his elder, or gets into a fight with an elder, majority of the people in the community will lecture him or her, or even punish him or her, for his or her disrespect to a senior person. Korean's believe respect and courtesy is the foundation of everything, and judge's others based on the respect and courtesy they show and represent to others.

In Korea, trust is the threshold of the culture, and teach children always to trust others from a young age. Besides this, the Korean culture forms a very close relationship between relatives, as well. Children learn these cultural values and traditions from their parents, teachers, and others, and continue to do these morals when they grow up and teach their children. They do not teach children to tattle on others as American's do, or teach people to become a nation

AFFIDAVIT OF JIN YEONG HWANG, PAGE SEVENTEEN

of cutthroats, who will "sell their souls to the devil" for any price. The children are taught to care about their neighbors, and if their neighbors face troubles, Korean's do not turn their face away from their problems because of politics.

Teachers further have authority, as much as a parent, to discipline the child, but teaches morals to trust others and not to lie to people. Children are taught to help people when they experience problems. After six years of elementary schooling, they attend middle school, and keeps their friendships between elementary schools, and in many cases, through life. This kind of friendship builds a greater trust and friendship. Still, in middle school, students meet more people and they study hard to get better grades, and academics, many times competing against friends to get into a better high school.

Still, these friendships sometimes have drawbacks, for example, when one seeks a loan and requests a guarantor. The one who co-signs becomes liable when the other fails to pay the loan payment. Or, when a friend has become a "judas" under American cultures and sets up a friend as a 'scapegoat' to save his own hide. Although the first, because of money, may happen in Korea culture, the second if a foreign action, and those who trust do not believe someone whose a friends would deceive them.

For over 5000 years the Korean culture have taught respect, trust, and traditions of friendship. Most Koreans in the past were farmers, and when time to work, neighbors would chip in to help each other. It is stated America was once this way, too. Even in the business world, co-workers go to lunch together, and will insist

AFFIDAVIT OF JIN YEONG HWANG, PAGE EIGHTEEN

on paying, because Koreans find happiness in giving..

After school, Koreans have to join the service, and serve their country. This occurs when students turn 19, subjected to the draft, and serve for about three years, learning to follow, even more, orders from others and obey them, and age is not an important role, being based upon rank. Once they leave service, Koreans are even more respectful to others.

In the Korean culture children cannot smoke in front of their parents, nor can they smoke freely in front of elders. Even when friends or people go out for drinks, their are rules and courtesy standards that must be adhered too. To break these rules or standards brings disrespect upon that person.

The father is the highest in the household. When parents get old, the oldest son holds responsibility to care for the parents. Normally, he takes the parents into his own home, or lives with them. The oldest son takes the responsibility of the father when the father passes away at an early age. Korean parents love their children more than anything, and will sacrifice everything for them, the children learning from these lesson and doing the same for their own. Children are never taught to tell on their parents, for this is contrary to all Korean culture, like Americans do.

Also, when children get married, they must introduce the mate to their parents, and only upon the parent's approval can theu marry. If the parents reject the mate, or refuse to agree, he or she cannot marry his or her mate. Parents do give great emotional and economic support to their children to get married and find a good mate. Upon marriage, the parents prepare a place of living and

AFFIDAVIT OF JIN YEOGN HWANG, PAGE NINETEEN

furniture for the children. After the wedding, the husband and wife visit their parents and show courtesy and respect of appreciate for the gifts. Guest show congradulations by giving money to the newly weds to start their life.

The most important items in Korean culture is trust and confidence between parties interacting. When a person meets an old friend, they become better friends. If the friend is in trouble, they offer their help unconditionally, and will not turn down a favor, providing it is not illegal, helping each other as much as they can.

Koreans follow the laws of society because punishment is somewhat severe. It is illegal to own a gin in Korea, and impossible to find a gun. Only soldiers and police have guns. Drugs are unfamiliar to Korea, extremely few people do drugs, and it becomes national news when they are caught, and their respect is dishonored. No one gets to see any drugs or guns in Korea, both being foreign to the culture, and these traditions have lasted for many generations, these tranditions being respected and followed by all who live in Korea. Korean people are humane and sympathetic.

In Korea, if a couple is married, and the male gets into trouble or sick, the female must return to either her or his family and the father must care for her. If she tries to work, she can only earn the lowest salary, because her husband is suppose to care for her, and she must respect this. If the fathers pass on, she must survice herself until her hisband can care for her again, or until he passes on, or a son becomes old enough to care for her and the family. These are the culture of my country.

AFFIDAVIT OF JIN YEONG HWANG, PAGE TWENTY

## VII.

Deponent had been recently married; because of his friend's betrayal to him, and using him as a 'scapegoat,' deponent's wife and family must live off her father, deponent's passing on while he has been in a American prison; her father must care for her because deponent is unable to, and it places a great burden on that father's resources. Deponent's lawyer never asked about deponent's culture or the problems the matter set upon his family's life.

## VIII.

That deponent had never been out of his country, even, in the past; he was new and excited; his "friend" paid for the trip, and talked him into coming to Guam; had deponent known the friend was into illegal activities, deponent would never had gone, but would have tried to talk his friend into stopping the conduct he was doing; deponent held no knowledge of this activity and had told all his attorneys this. The attorneys, especially attorney William, instructed deponent to tell the court he was guilty when deponent told him he was innocent. Deponent was under a state of duress, not knowing anyone, and having to rely on people he did not know and did not believe him, and therefore followed the attorney's guidance believing he would only receive no more than 10 years, and more likely, 25-30 months; had deponent known this was illegal, he would not had consented to the guilty plea, but went to trial.

## IX.

Deponent is actually innocent of the charges; he pled under the advice of his attorney, having no understanding of American courtrooms or procedures; had deponent understood that the attorney's were not doing for his best interest, and further having

deponent break the law, deponent would never had agreed; deponent is inocent of the crimes against him and because of the attorney's misguidance, his state of mind, believes the plea is not knowing and voluntarily made.

## X.

Deponent is willing to testify to these facts if the court deems it necessary.

## XI.

That deponent is totally dependent on others to help him, and must have everything translated, and believes the above facts are that as he set them to the party helping them, being unable to read english.

## XII.

That further deponent sayeth naught.

DATED this _//_ day of August, 2004.


JIN YEONG HWANG
# 02115-093; SS3-23L
FEDERAL CORRECTIONAL INSTITUTION
1900 SIMLER AVENUE
BIG SPRING, TEXAS 79720

Deponent--Defendant, Pro se.

## CERTIFICATE OF PROOF OF MAILING

The undersigned hereby certifies that he did cause to be mailed a true and correct copy of the foregoing Motion § 2255 and attachments, and served the same upon the attorney for the Respondent, First Class, postage prepaid thereon and addressed to:

> OFFICE OF U.S. ATTORNEY
> MARK E. KONDAS, AUSA
> SIRENA PLAZA
> SUITE 500
> 108 HERMAN CORTEZ AVENUE
> HAGÅTÑA, GUAM 96910

Mr. Kondas's last known address, all on this ⁣ day of August, 2004.

That the undersigned declares under the penalty of perjury that he deposited this into prison officials hands, per institution policy and custom for mailing to the above address, and declares the same as true and correct, this ⁣ day of August, 2004.

_____

JIN YEONG HWANG
# 02115-093; SS3-23L
Federal Correctional Institution
1900 Simler Avenue
Big Spring, Texas 79720

Defendant-Petitioner, Pro se.

GWS/cc: